Sarah Sims GARRETT et al.,
Plaintiffs,

v.

CITY OF HAMTRAMCK, a Municipal
Corporation, et al., Defendants.

Civ. A. No. 32004.

United States District Court,
E. D. Michigan, S. D.

May 21, 1975.

John M. Ferren, Hogan & Hartson, Washington, D.C., Michael Barnhart, Detroit, Mich., for plaintiffs.

Fred Mester, Asst. U. S. Atty., Detroit, Mich., for federal defendants.

Thomas C. Mayer, Detroit, Mich., Edmund E. Torcellini, Hamtramck, Mich., for municipal defendants.

## AMENDED ORDER

KEITH, District Judge.

### INTRODUCTION

This Court heard arguments on April 22, 1975 on the plaintiffs' Motion for Entry of an Amended Order. This motion was prompted by the Court of Appeals for the Sixth Circuit's decision of September 26, 1974 remanding this matter to this Court for further proceedings. 503 F.2d 1236.

This case has been before this Court since November 20, 1968. Since that time, nothing has happened to provide the plaintiffs with the relief they seek and justly deserve. This Court notes the Court of Appeals decision:

> A number of findings of fact are included in the court's orders and an examination of the record indicates that the underlying findings are supported by substantial evidence. The court could properly find that the Negro population of Hamtramck fell from 14.4 percent to 8.5 percent between 1960 and 1966 and that this resulted largely from implementation of the "planned program of population loss" adopted as part of the master plan of the Vilican-Lehman Report. *The record also supports the finding that the private housing market of Hamtramck was operated in a discriminatory fashion and that city officials were aware of this.* There is also considereable evidence of racism and prejudice against Negroes on the part of various city officials. All Negroes living in the original Wyandotte Project area were displaced by the first urban renewal actions there, and it is clear that they received little or no reloca-

> tion assistance. *We also conclude that the record supports the court's finding in its order of March 30, 1973 that the City of Hamtramck has intentionally discriminated against Negro residents in violation of their constitutional and statutory rights.*

> The relationship of HUD to this intentional discrimination presents a more difficult question. However, it is clear that various HUD officials were made aware of the disproportionate impact of Hamtramck's urban renewal programs on the Negro element of its population. Furthermore, HUD was advised of the non-existence of active relocation programs for persons displaced by urban renewal. The record supports a finding that HUD must have known of the discriminatory practices which pervaded the private housing market and the indications of overt prejudice among some of the persons involved in carrying out the urban renewal projects of the City. Since we have held that this action is not concerned with the completed projects or code enforcement, *we have no hesitation in holding that HUD should be held responsible for the legal implementation of the ongoing Wyandotte Project and any future urban renewal projects of Hamtramck which it approves.* This is especially true in view of the detailed administrative complaint which was concerned specifically with implementation of the amended Wyandotte Project. 503 F.2d at 1246. (Emphasis added).

The Court concluded:

> Although it is necessary to remand for further proceedings, we note the extreme complexity of this case and that *the district court correctly resolved the basic issues presented herein.* 503 F.2d at 1250. (Emphasis added).

■ This lengthy quotation from the Court of Appeals decision is necessary because of the defendants' response to that decision. Both classes of defend-

·ants, municipal and federal, approached the Appeals Court's remand of this action as if it signaled the need to relitigate the entire matter. The municipal defendants, particularly, took this approach. Their entire argument concentrated on whether this Court even had jurisdiction over them, and introduced the additional specious argument that present officials of Hamtramck could not be joined to this suit absent a showing that they have discriminated against the plaintiffs. Mayor of City of Philadelphia v. Educational Equality League, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed. 2d 630 (1974).

This Court has no intentions to have this matter relitigated. As the Court of Appeals noted, the basic issues in the case have been correctly determined. Additionally, the discrimination by the defendants has been documented here and affirmed by the Court of Appeals. The joinder of the present municipal officials is necessary, if at all, only to implement this Court's Order. The municipal defendants' argument that present discrimination must be proved against these persons is wholly without merit, and is part of a pattern of delay and obfuscation which has marked the proceedings herein over the life of this litigation. To accept the defendants argument would ignore the discrimination proved by the plaintiffs. Presumably, if the present officials are shown not to be discriminating, then the plaintiffs would be entitled to no relief. Such an argument is almost scandalous.

Likewise, the municipal defendants preoccupation with the so-called grave jurisdictional problems of this action is misplaced. The substance of the Court of Appeals holding on jurisdiction is found in one sentence:

> In its further consideration of this case the district court should determine the basis of its jurisdiction over each of the defendants and whether all of the defendants necessary for implementation of its decree are before the court. ⸴ 503 F.2d at 1249.

This order by the Court of Appeals was not meant to suggest that jurisdiction was lacking over any of the defendants, but rather was a request for clarification of this Court's jurisdiction, in light of the various jurisdictional basis alleged. The Court of Appeals never suggested that jurisdiction was a problem, as the municipal defendants seem to have concluded.

The Court of Appeals held that this Court had properly found United States Constitutional and statutory violations by all of the defendants. This supports "federal question" jurisdiction over all of the defendants under 28 U.S.C. § 1331. The only question is whether the amount in controversy exceeds $10,000, exclusive of costs and interests.

This Court holds that the amount in controversy exceeds $10,000, whether viewed from the defendants' viewpoint, Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971), Government Employees Ins. Co. v. Lally, 327 F.2d 568 (4th Cir. 1964), or from the plaintiffs' viewpoint, Fireman's Fund Ins. Co. v. Railway Express Agency, 253 F.2d 780 (6th Cir. 1958).

■ An additional major area of disagreement between the parties centers on how the survey of displacees should record responses. The defendants argue for a limited interpretation of responses designed to obtain a definite "yes" or "no" count. The plaintiffs argue for a more flexible approach which measures the leanings of the displacees. The Court agrees with the plaintiffs' flexible approach. As has been noted, already, the discrimination alleged and proved by the plaintiffs took place over five years ago. Since then, the persons displaced by the defendants have relocated, and until now, have had no indication that they could ever return to Hamtramck. To require them to respond positively that they would move into housing located in Hamtramck, after so many years have passed would be restrictive. In addition, such restrictions on the survey

would only serve to deny the plaintiffs the full relief to which they are entitled.

It has been said in the past that justice delayed is justice denied. The plaintiffs in this case have, up to now, been denied justice. The defendants, through dilatory tactics, have delayed, attempted to delay, and frustrated the implementation of any program to redress the grievous injustices for which they have been responsible. This Court wonders when they will cease their obstructive tactics and begin to correct these past injustices.

## ORDER

Upon consideration of the September 26, 1974, opinion and order of the Circuit Court of Appeals, and after reviewing the submissions of the parties and holding a hearing with respect thereto, this Court makes the following additional Findings of Fact and Conclusions of Law:

1. Plaintiffs properly represent the class composed of all Black citizens of the City of Hamtramck who have been or will be displaced from their homes in the Wyandotte, Denton-Miller, and Grand Haven areas of the City due to defendants' unlawful actions. Defendants include the City of Hamtramck, the Hamtramck City Planning Commission, and the United States Department of Housing and Urban Development. Also named as defendants in the Complaint were Joseph Grzecki, Mayor of the City of Hamtramck, Charles Kotulski, Director of Urban Renewal for the City of Hamtramck, Robert C. Weaver, Secretary of United States Department of Housing and Urban Development ["HUD"], and Thomas Kilbridge, Regional Director of HUD. Pursuant to Rule 25(d)(1), Fed.R.Civ.P., the Court hereby substitutes for the last-named parties the following defendants: William V. Kozerski, acting Mayor of the City of Hamtramck, William V. Kozerski, acting Director of Urban Renewal for the City of Hamtramck, Carla A. Hills, Secretary of HUD, and Don Morrow, Regional Director of HUD. All defendants necessary for implementation of the Orders in this case are before the Court.

2. This case arises under the Constitution and laws of the United States. The amount in controversy, as measured by the cost to defendants of the equitable relief sought here, far exceeds $10,000, exclusive of interest and court costs. See, e. g., Ronzio v. Denver & R.G.W.R.R., 116 F.2d 604, 606 (10th Cir. 1940); Miller v. Standard Fed'l S. & L. Ass'n, 347 F.Supp. 185, 188 (E.D. Mich.1972). Alternatively, the Court finds the jurisdictional amount requirement of 28 U.S.C. § 1331 met because the value to the plaintiffs of the relief sought here exceeds $10,000. This alternative finding is based upon the evidence introduced at trial in support of plaintiffs' good faith allegation that the damage to each plaintiff exceeds $10,000, which allegation and evidence defendants failed to rebut. See, e. g., Molokai Homesteaders Coop. Ass'n v. Morton, 506 F.2d 572, 576 (9th Cir. 1974). This finding is independently supported by the fact that this action has been certified as a "true" class action, and thus aggregation of plaintiffs' damages is proper. See, e. g., New Jersey Welfare Rights Org. v. Cahill, 483 F.2d 723, 725 n. 2 (3rd Cir. 1973). Accordingly, jurisdiction over all defendants is based upon 28 U.S.C. § 1331. In addition, jurisdiction over defendant Kozerski is also based upon 28 U.S.C. § 1343.

3. The provisions of this Court's Order of March 30, 1973, requiring provision of replacement housing for displacees from the Smith-Clay, Chrysler Expressway, and code enforcement projects must be eliminated.

4. Potentially, at least 515 to 604 replacement housing units in Hamtramck will be necessary to protect the rights of displacees, past and future, from the Wyandotte (R–31), Denton-Miller, and Grand Haven areas.

5. As noted in this Court's Order of March 30, 1973, 430 to 440 housing units can be built in the Wyandotte (R–31) area, consistent with good planning. Plaintiffs have proposed construction of that number of housing units on the Wyandotte site. The housing development plan submitted for that area by defendants City of Hamtramck, City Planning Commission, and Kozerski (hereinafter, "municipal defendants"), however, called for constructing no more than 318 units. Whatever housing plan this Court ultimately orders, it cannot be said at this time that the Wyandotte site alone will suffice to protect the rights of the plaintiff class to replacement housing in Hamtramck.

6. Accordingly, pending the results of an appropriate survey to determine the numer of eligible displacees desiring replacement housing in Hamtramck, there is no basis for eliminating any of the provisions of this Court's Order of March 30, 1973, designed to assure that existing units and the Alpena site may become available for housing the protected class.

7. Both plaintiffs and defendants have urged that some of the needed relocation housing must come from the existing housing market, so as to avoid an inappropriate concentration of low-income displacees in the Wyandotte area. *See* Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970).

8. The total time required for completion of the survey of displacees, the design of a final housing plan for Wyandotte, and the construction of new housing there will be at least two years, and probably longer. As a matter of equity, displacees should not have to wait that long to move back to the City if they prefer access to existing units and such units can be made available to them. Thus, Parts VIII (preservation of existing units), IX (open housing ordinance), X (assistance in obtaining existing units), and XI (relocation expenses) of this Court's Order of March 30, 1973, should immediately be implemented by defendants, as modified below in conformity with the Court of Appeals' opinion.[1]

9. Following completion of the above-mentioned survey of displacees, it may become necessary, as a matter of law, to implement not only the provisions referred to in paragraph 7, above, but also the other provisions of this Court's Order of March 30, 1973, that guarantee the plaintiff class access to existing units and, possibly, to the Alpena site as well. These other provisions (Parts II, III, VII, and XII) accordingly should be stayed pending completion of the survey of displacees and the further order of this Court; but defendants are admonished to take no action inconsistent with full implementation of these other provisions by final order of this Court in the near future.

10. Similarly, to preserve the existing units that eventually may be needed to house displacees, the portion of Part VI of this Court's Order of March 30, 1973, preserving the status quo of the Grand Haven area, should continue in effect. The portion of Part VI requiring a study of the continued residential potential of the Grand Haven area should be stayed pending the survey of displacees and the further order of this Court.

11. Although fundamentally appropriate and includible in a final order, Part I of this Court's Order of March 30, 1973, pertaining to redevelopment of the Wyandotte site and Part V of said Order establishing priorities for replacement units should be stayed pending the survey of displacees and the further order of this Court.

12. The contemplated survey of displacees will not elicit an accurate deter-

---

[1]. Relocation expenses should be paid in accordance with existing law. The plaintiffs should not have to bear the burden of changed economic conditions which have taken place during the pendency of this action.

mination of their desire for replacement housing unless a credible, detailed presentation of their housing prospects in Hamtramck is made on behalf of defendants by an established, perceptibly independent private research and interviewing firm. The representatives of such a firm should personally visit all displacees for a thorough discussion of their housing needs and options, including their right to relocation expenses. Displacees should be shown pictures of possible (though preliminary) development plans for Wyandotte, including site plans and types and sizes of residential units. The plans previously submitted to this Court by plaintiffs and the municipal defendants, prepared by Messrs. John Loss and Christopher Wzacny, respectively, would convey, with necessary concreteness, the kinds of site plans and housing types and sizes for Wyandotte that displacees have a right to expect.

Therefore, it is hereby ordered:

I. (Formerly Part IV)

Defendants shall undertake a comprehensive effort to contact all Black persons who have been displaced from their homes in the Wyandotte, Denton-Miller, and Grand Haven areas by urban renewal projects and other actions of defendants held to be unlawful by this Court's opinion of November 22, 1971, and by the Court of Appeals' opinion of September 26, 1974. Defendants shall also make such an effort to contact all persons who presently reside in the Wyandotte, Denton-Miller, and Grand Haven areas. The purpose of this notification effort is to determine how many of these persons, comprising the class entitled to protection by this Court, desire replacement housing in Hamtramck, including equitable relocation expenses.

In order to make known to displacees the housing and related benefits available as a result of this litigation, defendants shall retain the services of an established private research and interviewing firm to design the details and carry out the mechanics of the notification process. This process shall comply with all the minimum requirements of a relocation assistance advisory program, as outlined in 24 C.F.R. §§ 42.100–42.115 (1972) and Act No. 227, Mich.Public Acts of 1972, § 3, M.C.L. § 213.321 et seq.; and, in addition, shall contain the following essential elements:

A. There shall be periodic notices, over sustained periods of time, in the newspapers and on radio stations directed especially at the Black community in the Metropolitan Detroit Area, as well as in the other, more widely received newspapers, radio, and television stations.

B. There shall be a sustained effort to trace all displacees and make personal visits to their present homes, at a time convenient to each displacee, in order to explain thoroughly the relocation opportunities, including the payment of relocation expenses, and to answer all questions. Such presentations shall include showing the displacees drawings and photographs of the site plans and dwelling units designed for the Wyandotte site by the experts who worked with plaintiffs and the municipal defendants in connection with their presentations to this Court at the hearings in December, 1972-January, 1973. Displacees shall be told that these plans and drawings are preliminary examples of the type of residential development that can be expected in Wyandotte. The presentations by home interviewers shall also explain the displacees' opportunities for replacement housing in existing units, pursuant to Part II of this Amended Order.

C. After a full presentation of the alternatives, each displacee shall be asked to indicate whether he or she desires replacement housing in Hamtramck. The independent interviewing firm shall be instructed to count "yes" every displacee who expresses an interest in replacement housing in Hamtramck, and to count "no" only those who are clearly uninterested in such housing. Each displaced household shall be asked, in addition, to indicate its specific needs as to housing type and size

(consistent with applicable HUD relocation criteria). The firm shall be instructed to keep detailed records of all responses.

D. A procedure shall be developed whereby every displacee who cannot make a decision at the time of the home interview can register his or her desire for replacement housing with a central office within 15 days from the date of completion of the interviewing process.

E. Displacees also shall be informed that the process of final planning and construction of new units on the Wyandotte site may take as long as two years or even more. All persons who already have been displaced shall be informed that they have the option of receiving immediate assistance in seeking existing units in Hamtramck for replacement housing, as more fully described in Part II.D. below. All such displacees shall therefore be asked to register their preference for new or existing units. Present residents of Wyandotte, Grand Haven and Denton-Miller shall be asked their preference as to eventual relocation in the Wyandotte area or in existing units in other areas of the city, including Grand Haven (in case a residential rehabilitation plan for Grand Haven is ordered by this Court).

F. Counsel for the parties shall negotiate and agree upon the selection of an eminently qualified private research and interviewing firm for purposes of this Amended Order, and shall arrange for the parties' joint supervision of the survey process. Any unresolvable dispute shall be submitted to the Court.

II. Pending completion of the foregoing notification process and tabulation of the number of displacees who desire replacement housing, defendants shall immediately implement Parts VI (in part), VIII, IX, X, and XI of this Court's Order of March 30, 1973, as modified, respectively, below in paragraphs A. through E.:

A. *(Formerly Part VI)*

(1) Municipal defendants are hereby enjoined from undertaking any residential code enforcement in Grand Haven without providing the persons thus displaced with decent, safe, and sanitary relocation housing within the City of Hamtramck; except that, in cases of emergency where continued occupancy would be dangerous to the health and safety of the residents of the substandard units, relocation housing may be provided outside the City, if necessary, so long as it is convenient to transportation, public facilities, and the displacee's place of work;

(2) Municipal defendants shall submit for approval by this Court any proposal for rehabilitation or renewal of Grand Haven, however financed, involving any of the defendants or their agents; and

(3) Until concrete plans for the Grand Haven area have been developed by the City (with the requisite citizen participation) and approved by the Court, municipal defendants are hereby enjoined from taking any action (a) to rezone any part of Grand Haven to an industrial or commercial category, or (b) to grant a variance for industrial or commercial use in Grand Haven, or (c) to issue any building permits for nonconforming uses, or (d) to grant any demolition permits for Grand Haven (except in case of unmistakable emergency, as discussed above), or (e) to acquire or condemn any property in Grand Haven for nonresidential public use.

B. *(Formerly Part VIII)*

Until the relocation housing requirements of all eligible displacees have been met, defendants are hereby enjoined from taking any action (e. g., through condemnation, acquisition, or issuance of demolition permits) which will facilitate the elimination of housing units in the City, unless a corresponding number of new units (in addition to those built for the displacees counted pursuant to the

survey referred to in Part I, above) are provided within the City.

C. *(Formerly Part IX)*

In order to break down the pervasive pattern of private discrimination within the tightly closed Hamtramck housing market, defendant City shall amend its open housing ordinance, Hamtramck, Mich.Ord.No.347 (1972), in a manner which will permit the application of the ordinance to a significant percentage of real estate transactions in Hamtramck and assure that all who seek housing in Hamtramck will have an equal opportunity to learn about and gain access to any available housing. The current Hamtramck open housing ordinance is hereby declared insufficient to accomplish those ends or to comply with this Court's prior order of November 22, 1971. The municipal defendants shall submit their proposed amendments to plaintiffs and this Court no later than 30 days from the date of this Amended Order.

D. *(Formerly Part X)*

In order to assure that displacees obtain access on a nondiscriminatory basis to the existing private housing market in Hamtramck, defendants shall establish a procedure whereby relocation and/or public housing officials, as appropriate, (a) will accompany displacees who wish to inspect Hamtramck housing units offered for rent or sale on the open market, (b) will attempt to persuade the owner to rent or sell the unit to the displacee (on a nondiscriminatory basis); and (c) if the displacee is eligible for public housing, attempt to persuade the owner to rent or sell the unit under the applicable federal or state leased housing or acquisition program, for the benefit of low-income families.

E. *(Formerly Part XI)*

As a matter of providing complete equitable relief, in order to assure that displacees can take advantage of the relocation housing made available by this Amended Order and by the final order eventually entered in this case, defendants shall jointly adopt procedures and provide funds for adequate moving expenses and other relocation payments to displacees. The Court hereby notes for defendants' consideration and guidance that these benefits and procedures would be deemed adequate if they are patterned after those presently enumerated in the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §§ 4601–4655 (1970), as interpreted in 24 C.F.R. §§ 42.1–42.365 (1974).

III. The parties shall jointly certify to the Court the results of the survey undertaken pursuant to Part I of this Amended Order. After the number of displacees who desire replacement housing has been determined, the parties shall submit to the Court their respective proposals for a final order in this case, including their proposed inclusion and/or modification of the following provisions of this Court's Order of March 30, 1973, which are hereby stayed pending further Order of the Court:

Part I—establishing guidelines for development of the Wyandotte site.

Part II—requiring residential development of the Alpena site.

Part III—requiring displacees who own homes in Hamtramck and wish to apply for housing in Wyandotte to offer their existing units for sale to prospective purchasers, including other displacees, referred by the City's relocation officials.

Part V—establishing rules of priority for replacement units.

Part VI, first sentence—requiring a thorough study and review of the residential potential of the Grand Haven area.

Part VII—requiring the rezoning of six designated areas.

Part XII—requiring provisions of replacement housing in Detroit or elsewhere in the Metropolitan Area if enough adequate replacement housing does not become available in Hamtramck.

IV. In accordance with the September 26, 1974, opinion and order of the Court of Appeals, defendants shall be jointly responsible for financing the portion of the costs of Part I and of Parts II.D. and E. of this Amended Order allocable to surveying the present and former residents of Wyandotte. The municipal defendants shall be responsible for financing the portion of the costs of Part I and Parts II.D. and E. allocable to surveying the present and former residents of Grand Haven and Denton-Miller, plus the costs, if any, of carrying out Parts II.A.–C. hereof. In this connection, however, the Court notes the availability of funds from HUD to the municipal defendants under Sections 103(b) and 105–06 of the Housing and Community Development Act of 1974, Pub.L.No.93–383, 88 Stat. 633, for local planning, redevelopment, and relocation assistance. The Court accordingly orders defendants to discuss forthwith making such federal funds available to the municipal defendants for purposes of financing their responsibilities under this Amended Order.

V. Except for good cause shown, defendants shall retain the private research and interviewing firm, as required by Part I of this Amended Order, no later than 30 days from the date hereof; shall complete carrying out the survey required by Part I of this Amended Order, including tabulation and certification of the results to this Court, no later than 150 days from the date hereof; and shall implement the requirements of Parts II.A. and B. immediately and Parts II.C., D., and E. no later than 30 days from the date hereof.

VI. This Court shall retain jurisdiction over this matter to enter such further orders as may be appropriate to effectuate the provisions of this interim Amended Order and to grant complete relief to the plaintiff class in the final order to be entered after completion of the survey process required by Part I hereof.